UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

JOHN ALLEN,

Defendant.

Case No. 8:24-cr-153-WFJ-AEP

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant John Allen, through counsel, submits this sentencing memorandum.

## I. Introduction

On July 30, 2024, Mr. Allen pled guilty to Count One of the Indictment, which charged him with possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). Mr. Allen has been in custody since April 9, 2024, when he was arrested for unrelated state charges. He has been in federal custody since June 5, 2024. A sentencing hearing in this case is scheduled for December 9, 2024.

## II. Sentencing Guidelines Calculation

"As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" when a district court is imposing a sentence. *Peugh v. United States*, 569 U.S. 530, 536

(2013) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). "The post-*Booker* federal sentencing scheme aims to achieve uniformity by ensuring that sentencing decisions are anchored by the Guidelines . . . ." *Id*. at 541.

Mr. Allen has no objections to the sentencing guidelines calculation in the PSR. Doc. 32, ¶ 88. The total offense level is therefore 12 and the criminal history category is VI. As a result, the advisory sentencing guidelines range is 30 to 37 months of incarceration.

## III. Recommended Sentence

After considering the advisory sentencing guidelines, a district court must then consider "the arguments of the parties and the factors set forth in § 3553(a)." *Peugh*, 569 U.S. at 536. For the reasons below, the Court should impose a guidelines sentence.

### A. History and Characteristics of Mr. Allen

John Allen is a man who for almost his entire life has struggled with addiction. He was actively using methamphetamine in the time leading up to his arrest in this case, and he knows it contributed to his present circumstances. He is sincerely frustrated and emotional about where he ended up in life and wants nothing more than to make permanent and positive changes.

Mr. Allen is his own person. He is certainly responsible for his actions in this case and in his many other convictions. However, repeated negative cycles

in his life coupled with his serious substance abuse issues got him to where he is today. Without the benefit of a stable family unit, he stood a minimal chance to succeed from the earliest age and continuing into adulthood.

In anticipation of sentencing, the defense requested that Professor Brendan Lantz and Desiree Meaton-Francisco each individually evaluate Mr. Allen. They were each asked to address one of two significant aspects of Mr. Allen's history and characteristics: his membership in the Unforgiven and his years of abusing drugs. *See* Ex. 1 and 2.

According to Professor Lantz, who is a professor of criminology and criminal justice at Florida State University, Mr. Allen joined the Unforgiven not because of its extremist ideology, but rather out of a sense of loneliness in prison and a desire for protection from physical violence. Professor Lantz describes Mr. Allen as someone who was isolated in prison and craving the social ties he could not get from his family. Mr. Allen admittedly regrets his decision to join the Unforgiven (and even requested to leave at one point) but knows he cannot disavow the group without severe consequences. Despite this, Mr. Allen has tried to avoid associating with the group while he is out of custody and has a desire to turn his life around.

Mr. Allen's membership in the Unforgiven is just one example of the many impulsive and bad decisions he has made throughout his life. Ms. Meaton-Francisco describes in detail the significant trauma Mr. Allen has

experienced and how those events influenced his negative decisions over the years. More than anything else, it should be readily apparent after reviewing both Professor Lantz's report and Ms. Meaton-Francisco's report that Mr. Allen has become locked into a loop of negative life experiences that continue to be driven by his drug use. For Mr. Allen, drugs became a way to deal with the stresses of life.

Mr. Allen has been to prison several times and, at 53 years old, he would like this to be his last. While incarcerated, Mr. Allen wants to once and for all end his drug habit, and requests the Court recommend all available treatment. He would also like to receive vocational training so he may maintain financial stability after he is released.

**B. Nature and Circumstances of the Offense**

This case involves a run-of-the-mill gun possession offense. On December 21, 2023, Mr. Allen went to visit his girlfriend in Winter Haven. Seconds after leaving her home on his bicycle, the police pulled Mr. Allen over. Law enforcement's stated reason for the traffic stop was that Mr. Allen did not have a sufficient light on his bicycle. During a subsequent search, the police discovered a small amount of marijuana and a handgun in Mr. Allen's possession.

/ / /

/ / /

### C. Need for Drug Treatment

Mr. Allen has a lengthy history of substance abuse issues that began when he was a child. *See* Ex. 1. His methamphetamine use led him to his current federal charge and his most recent arrest included a charge of possession of methamphetamine. Drugs have consumed his life at times and been the cause of so many of his interactions with the criminal justice system. Because drug abuse has been an issue for Mr. Allen for so long, he recognizes that he must put in significant work to break his habit. Mr. Allen is agreeable to, and wants, ongoing and intensive drug treatment.

## IV. Conclusion

Based on the above, including Mr. Allen's history and characteristics, as well as his need for substance abuse treatment, the Court should impose a guidelines sentence. That is the sentence that is "sufficient, but not greater than necessary" to further the purposes of federal sentencing. 18 U.S.C. § 3553(a).

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Dated this 2nd day of December, 2024.

Respectfully submitted,

A. Fitzgerald Hall, Esq.
Federal Defender

/s/ Douglas J. Stamm
Douglas J. Stamm, Esq.
Florida Bar No. 0092069
Assistant Federal Defender
400 N. Tampa St., Suite 2700
Tampa, FL 33602
Telephone: (813) 228-2715
Fax: (813) 228-2562
E-mail: douglas_stamm@fd.org

Attorney for John Allen

**CERTIFICATE OF SERVICE**

I certify that on December 2, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

/s/ Douglas J. Stamm
Assistant Federal Defender

# Exhibit 1

# Clinical Psychosocial Assessment

**Defendant:** John Allen

**Case #:** 8:24-CR-153-WFJ-AEP

**Date of Assessment:** 9/23/24

**Assessment Procedures:**

9/23/24 Forensic Clinical Interview with Defendant
9/23/24 Mental Status Examination with Defendant
Review of United States District Court Indictment
School Records
Arrest History Records
Administration of the Simple Screening Instrument for Substance Abuse
Administration of the Mental Health Screening Form-III
Administration of the Patient Health Questionnaire (PHQ-9)
Administration of the PTSD Checklist for DSM-5 (PCL-5)
Administration of the Generalized Anxiety Disorder Screener (GAD-7)
Administration of the Mood Disorder Questionnaire (MDQ)

**Presenting Problem:**

John Allen is a 53-year-old Caucasian single father of one child awaiting sentencing for charges related to felon in possession of a firearm and grand theft of a motor vehicle. Additional information for this assessment was obtained through a clinical interview with Mr. Allen including administration of the Simple Screening Instrument, Mental Health Screening Form-III, PHQ-9, PLC- 5, GAD-7, MDQ and review of collateral records. The interview was conducted in a confidential manner at the Citrus County Jail in Lecanto, FL.

**Mental Health Status Exam:**

Mr. Allen was orientated to person, place, time, and circumstance. He was cooperative, easily engaged and provided relevant appropriate responses to asked questions. Hygiene, dress, and grooming were appropriate to the season and the structured environment. He appeared to understand the purpose of the interview. His flow of speech was within normal range and appropriate to the topics being discussed. His thought process was relevant following the flow of the interview. He was able to give detailed historical information about experienced traumatic and historical events. He denied experiencing current or historical hallucinations and delusions. His mood, affect and emotional

regulation were stable. He appeared to acknowledge his behaviors which led to involvement with the criminal justice system which had a direct correlation with his substance use. His insight was intact and judgement was defined as having poor impulse control which is further exacerbated in a negative manner when under the influence of substances.

He reported two previous episodes of treatment to consist of residential levels of care to treat substance use symptoms. It should be noted that both episodes of treatment were completed successfully. He did not report a history of mental health diagnoses in his family of origin. Mr. Allen denied being Baker Acted or Marchman Acted. He explained suicidal ideations beginning in adolescence to then subside in adulthood. On the day of the interview Mr. Allen denied current suicidal, self-harming or homicidal ideations.

**Substance Abuse History:**

Mr. Allen reported a progressive extensive substance use history beginning at 7 years old in an experimental fashion (cannabis and alcohol) escalating to daily methamphetamine and cannabis use. Cannabis use was reported to begin at 7 years old to then develop into a daily pattern of smoking up to four joints per day with last use in April 2024. Regular alcohol usage was described to begin at 17 consisting of weekend use of "3-4 shared cases of beer" until 19 years old. Most recent alcohol use was described as social with last use in March 2024. Methamphetamine use was reported to begin at 16 years old smoking up to "a $1/16^{th}$ every couple days" with last use on 4/14/24. Cocaine (crack) use was reported for six months during teenage years. He reported experimentation with molly, suboxone and spice (K-2) with no continued use. He explained longest period of abstinence from all substances except alcohol was during 2012. Use and/or experimentation of all other mind-altering substances was denied. He reported substance use as self-medicating to alleviate his inability to cope with stressful/emotional situations.

Mr. Allen reported suffering with withdrawal symptoms without medical oversight numerous times.

**Relevant History:**

Mr. Allen described a childhood/adolescence to consist of adverse experiences such as: onset of suicidal thoughts, victim of excessive physical and verbal abuse, educational challenges related to a learning disability, exposure to parental substance use, lack of emotional support/validation and an early onset of substance use.

He described living with his mother and father for the first 3 years of his life at which time his parents divorced where he initially remained with his mother. He explained living between his mother, father and grandfathers residence throughout high school. Mr. Allen reported his father to be physically and verbally abusive in an excessive manner during his childhood to consist of: beatings with belts, physical altercations, and verbal abuse. He described a good relationship with his mother and a strained relationship with his father. He reported beginning to experience behavior challenges in school and first experimentation with substance use in elementary school. He explained exposure to substances such as cocaine and crack by his father.

Teenage years were explained to consist of progressive substance use (cannabis and methamphetamines), a decline in academics, problematic behavior in school, lack of parental support, lack of emotional support and peer group change to consist of substance using individuals. During this time, he disclosed moving out of the family home, being introduced to additional substances, exposed to unsafe situations due to lack of stable residence and normalization of the use of substances. It should be noted that onset of suicidal ideations began in teen years. Mr. Allen indicated early independence in decision making due to lack of parental oversight which resulted in a decline in grades and behavior in high school.

He reported further decline in functioning in adulthood to include increased use of substances, experienced depressive symptoms, experienced traumatic events, and involvement in the criminal system. Various traumatic experiences during adulthood were explained to include loss of his mother, witnessing and involvement in various physically violent altercations, being stabbed twice and egregious physical and verbal incidents while being incarcerated. It was during this time he noted an increase in the intensity of depressive symptoms and an increase in substance use. He described his substance use to have a negative effect on his relationships and to interfere with his ability to deal with life stressors.

Mr. Allen explained loss of control of his behavior when under the influence of which resulted in a further decline in functioning with an inability to change due to severe addiction and untreated mental health symptoms. He noted a continuation of his struggle to remain abstinent and avoid criminal behavior due to his developed and established patterns of behavior. Mr. Allen demonstrated a cycle of behavior that was reinforced by brain chemistry changes due to addiction and untreated mental health symptoms resulting in interactions with the law.

**Educational and Employment History:**

Retention of kindergarten along with being diagnosed with an unknown learning disability was

reported during elementary school. Mr. Allen reported losing interest in school during middle school years. He reported a further decline in academics due to substance experimentation, and physical and verbal abuse in elementary, middle, and high school. He reported completing the 9th grade to then drop out of school in 10th grade. He explained obtaining his GED at 44 years old. Mr. Allen disclosed a history of being employed in air conditioning/refrigeration, customer service and construction industry beginning in high school. He explained enjoyment in working and a desire to return to full time work in the heating, ventilation and air conditioning industry.

**Clinical Impression:**

Mr. Allen is a 53-year-old male; he had a significant psycho-social history marked by adverse childhood experiences, victim of verbal and physical abuse, exposure and normalization of substance use by a parental figure, experienced traumatic events, and an onset of what turned out to be a problematic substance abuse history. He explained early independence in decision making due to lack of parental and emotional support accompanied by early onset of substance experimentation which progressed to full addiction.

Mr. Allen disclosed a substance use history which began at 7 years old in an experimental fashion to then increase to daily use of various substances beginning in adolescence. He meets criteria for Stimulant (Methamphetamine) and Cannabis Use Disorder – Severe as evidenced by taking the substances in larger amounts over a longer period of time than was intended, a persistent desire to cut down or control use, a great deal of time is spent in activities necessary to obtain the substance or control use, cravings, use resulting in failure to fulfil major role obligations at work, school or home, continued use despite recurrent social or interpersonal problems cause by use, tolerance and withdrawal. He presented some criteria of Major Depressive disorder as evidenced by depressed mood nearly every day, feelings of worthlessness/helplessness, psychomotor agitation and irritability. It should be noted that criteria for full diagnosis was not met and further evaluation is recommended.

Mr. Allen appears to take responsibility for his substance use and behavioral health concerns and recognizes that he acts impulsively without thinking through the consequences which is exacerbated when under the influence of mind-altering substances. He mentioned that he is aware of the negative effects of using substances and untreated depressive symptoms which may have led to interactions with the law. Due to his negative peer group, poor decision-making skills, history of untreated substance use and mental health symptoms, it is likely that he would resort to using again if he does not have an opportunity to treat his substance abuse and begin to treat his behavioral health

concerns.

Simple Screening Instrument for Substance Abuse (SSI-SA) resulted in a score of 8 indicating a high degree of substance abuse. Mental Health Screening Form-III resulted in a score of 5 indicating a moderate degree of probability of behavioral health symptoms. Patient Health Questionnaire screening tool resulted in a score of 2 indicating a mild level of depression symptoms. The PCL-5 screening tool resulted in identification of a high frequency of experienced symptoms due to effect of trauma. Generalized Anxiety Disorder screening tool (GAD-7) resulted in a score of 0 indicating no level of anxiety symptoms. Mood Disorder Questionnaire screening tool (MDQ) resulted in a score of 5 indicating a mild presence of a mood disorder.

It is recommended that Mr. Allen receive inpatient substance use and mental health treatment in a RDAP structured program. Treatment should include utilization of cognitive behavioral and rational emotive behavioral therapy to address his behavioral health and substance use/behavioral health needs. Mr. Allen would also benefit from evidence-based psychotherapy focusing on traumatic events to treat unresolved emotions related to experienced trauma. Treatment should include: intensive group therapy, frequent individual therapy sessions, a psychiatric assessment, medication management consultations/treatment, frequent urine analysis tests, 12 step modeled groups, intensive case management and care coordination. Recommended treatment should also address the disease of addiction, potential behavioral health symptoms, criminal thinking behavior patterns to include recognition and management of congruent behaviors. It is also recommended Mr. Allen be evaluated at the end of inpatient treatment to determine is a step-down transition plan needs to include a form of outpatient therapy along with medication supervision to address both mental health and substance use symptomology.

**Diagnostic Impression:**

F15.20 Stimulant Use Disorder (Methamphetamine) – Severe

F10.20 Alcohol Use Disorder – Severe

F12.20 Cannabis Use Disorder - Severe

[signature], LMHC MCAP 10-21-24

Desiree Meaton-Francisco, LMHC, MCAP Date

Licensed Mental Health Counselor/Qualified Supervisor # MH 12373

Master's Level Certified Addiction Professional # ADC-011042-201

# Exhibit 2

Prepared by: Brendan Lantz, Ph.D.

11/2/2024

Re: John Allen

I am a Criminologist and Associate Professor of Criminology and Criminal Justice, and the Director of the Hate Crime Research and Policy Institute at Florida State University. I received my Ph.D. in Criminology from The Pennsylvania State University, one of the top ranked criminology programs in the country. I have significant expertise in hate groups and related behavior, hate crime offending, and victimization, and have been conducting research consistently in this area for the last 13 years; over that time, I have published more than 50 peer-reviewed research articles and book chapters on hate crime, violence, and related topics. My hate crime research has been funded through grant programs from highly competitive national research agencies, including the National Science Foundation and National Institute of Justice. My related research on violence has also been funded by the National Institutes of Health, National Instituted on Minority Health and Health Disparities, and the Bureau of Justice Statistics (where I was a Research Fellow during my Ph.D. studies). I have also received several highly prestigious national awards for my work on hate crimes, including the American Society Criminology Victimology Faculty Researcher of the Year (2022) Award, the Academy of Criminal Justice Sciences (ACJS) New Scholar Award (2021), and the ACJS Victimology New Scholar Award (2020). I have provided expert background/opinion, or my work has been referenced, in a variety of media outlets, including *CNN*, *Newsweek*, *New York Times*, *USA Today*, *The Hill*, *Miami Herald*, *Chicago Tribune*, *Vox*, *PolitiFact*, and dozens of other outlets. I have also been invited to discuss or present my work as an invited expert at the White House, the Florida Senate, for various hate crime task forces (in Florida, Connecticut, and California), and in a host of other venues (e.g., victim services associations, county bar associations, hosted forums). In short, my experience and expertise in this area is extensive.

On Wednesday, October 30th, I met with Mr. John Allen in the Citrus County Jail. I subjected Mr. Allen to considerable questioning, and we discussed his entry and participation in the Unforgiven group, over a span of several hours. During this time, I identified several critical factors associated with his trajectory into this group. Most of these factors were not necessarily the result or consequence of ideological or overtly bigoted viewpoints, but of themes which are highly consistent with existing research on hate group recruitment which notes recruitment strategies which manipulate individual feelings of risk of victimization and isolation. I highlight each of the factors that I identified below.

*Factor 1: Strain/Isolation in an Institutional Setting*

A wealth of research has emphasized and highlighted the role that individual alienation and isolation plays in hate group recruitment. It is well established that these groups target individuals who are experiencing what criminologists might refer to as anomie, or strain resulting from a sense of rootlessness or normlessness in their own lives. This state is particularly evident in institutional settings characterized by a high degree of isolation and deprivation, as is the case during periods of incarceration. In many instances, a normative individual response to combat

this state of being is to search for and assume new identities within a group and then redefine identity within that group context, thereby partially resolving these feelings. Hate group recruitment ideology is structured to manipulate these emotions, by specifically targeting those who are dealing with noxious stimuli and providing a context for understanding and responding to them. In this regard, Mr. Allen self-asserted that he did not seek the group out in prison, nor did he hold particularly prejudicial viewpoints prior to joining. He became aware of them "by happenstance," and described his primary motive in joining them as a desire to be part of a group that he interpreted as protecting others from victimization. At one point, he said "the real draw was just not being alone in here."

It should be noted that race-based groups, like the Unforgiven, tend to gain salience for individuals following the occurrence of negative life events. Mr. Allen consistently referenced, in particular, the death of his mother—who he described as "his rock" and "the only one who understood him." He spoke fondly regarding her hard-working spirit, noting that she worked two or three jobs for most of his childhood to support him and his siblings. He appeared to be especially affected by her death and the attempt of his family to hide this death from him, anticipating that he might take it particularly harshly. While his membership preceded this death, it is clear that the group became more important during this time, as a source of surrogate family. This is consistent with existing research on individual susceptibility and the recruitment and retainment ability of hate oriented groups, and I believe it was a major factor in further facilitating his membership.

*Factor 2: Fear and Short-term Concern for Individual Wellbeing*

When identifying potential recruits, hate/extremist groups look for people going through substantial life change, and then target the emotions that accompany that change. They tend to focus, in particular, on manipulating fear-related mechanisms to promote recruitment. In my conversation with Mr. Allen, the most noxious salient stimuli during his incarceration was clearly the risk of victimization while inside, not just for himself, but for others. From his perspective, he found himself particularly motivated by what he saw as elevated victimization risk among white inmates, a message that the Unforgiven group emphasizes as a key recruitment tool. Intergroup race-based conflict is well documented in prison and jail-based settings—including in Florida—and Mr. Allen described witnessing several such incidents during his time. The group was "sold" to him as a form of protection, and he clearly sees it as fulfilling that role, both for him and for others. He was not shy about describing his own victimization, saying that he had "the shit beaten out of him many times," and being in the group sometimes reduced that. He acknowledged that it also increased it at times, however, in instances where he was victimized for his group membership.

Stated simply, many individuals who join or are recruited into extremist groups do so not necessarily because of strong ideological motivations, but because of a desire to establish a tough reputation for themselves based on their ties to the group and acquire shelter or protection from victimization; Mr. Allen appears to fit this pattern well. Mr. Allen is acutely aware of racial segregation in incarceration settings. One of the primary nonideological functions of extremist participation—especially in prisons—is the establishment of reputation; Mr. Allen believed that he needed such a reputation for protection in prison, and he did not perceive viable alternatives

outside of the group for such protection. This factor was critical in structuring his attraction to the group, as well as his sustained membership in a correctional institution.

*Factor 3: Low Self-Control*

While not necessarily a risk factor that is specific to his group membership, one thing that was apparent throughout my conversation with Mr. Allen were his consistent issues with impulse control and self-control. A large body of research in criminology has shown support for the self-control theory of crime, which emphasizes that the decision to commit crime is governed by the consideration of short-term, immediate benefits, without further consideration of long-term costs. Indeed, many elements of Mr. Allen's criminal history are highlighted by momentary impulses absent careful consideration of consequences, a fact he openly acknowledges. Mr. Allen consistently noted his regret for previous lack of foresight and the consideration of delayed consequences. Most importantly, he expressed the desire—unsolicited by my own questions—to seek help in managing his impulse control, including whatever mental health services he might be able to access during his incarceration. Recent research suggests that individual levels of self-control are malleable and can be subject to change at any age; if Mr. Allen is serious about seeking such help, it could be a promising avenue for reducing his offending in the future.

*A Note on Mr. Allen's Current Relationship with the Gang*

Finally, it is important to contextualize Mr. Allen's current relationship with the gang. It should be noted that he has no stated intention to leave the gang (a point I return to below), but it is also clear that Mr. Allen grapples with the state of his membership. He has a clear and obvious gang-related tattoo (i.e., "a patch") on his scalp; at several points, he described this tattoo as one of the worst mistakes he "has ever made in his life." He also noted that, while he does not feel he can do so while incarcerated without risking victimization, he enjoys being able to "cover" his patch by growing his hair out, either when he is not incarcerated or in solitary. When asked to describe his day-to-day interactions with the gang in and out of an institutional setting, he emphasized that he only interacts with the group when incarcerated, but that he tries to avoid them as best he can when he is not. He seemed to be self-aware of the potential for interaction outside of an institutional setting to escalate into offending, and expressed a desire to avoid that; it was also clear that he saw the gang ties as less valuable outside of an institutional context.

On average, Mr. Allen described his day-to-day activity within the context of the group as predominantly social in nature. Such a pattern is consistent with research on extremist/hate groups more broadly, which finds that the majority of their daily activities are non-criminal. When I asked him explicitly about direct participation in bigoted/racially-motivated harassment or violence, Mr. Allen stated that he never engaged in any directly or indirectly, and emphasized that the majority of his criminal history was non-violent, with a few exceptions. Most people who join hate groups only remain an active member for as long as the group (a) meets individual/personal needs (e.g., resolving feelings of isolation, fear) that would otherwise be unmet; or (b) solves problems that would otherwise be unsolved without the group. When a group no longer meets these needs or solves these problems, members typically seek to move on. Most interesting to me was Mr. Allen's stated interest in disengaging from the gang even within an institutional context. He noted that he would not leave without permission, citing the risk of

violent retaliation for doing so, but indicating that he had at one point put in a formal request to be "retired" from the gang, a form of honorable discharge which would allow him to disengage with permission. While he reported that his request was denied, this can be interpreted as significant evidence for his desire to disengage. Formally severing ties with any hate/extremist group without permission carries a physical risk of violence/victimization for anyone who chooses to do so. Mr. Allen is acutely aware of this risk to himself, and this has been a primary driver of his decision to retain membership, especially while incarcerated.

Mr. Allen also noted several factors during our conversation that I would describe as positive indicators. He noted recent developments in his spirituality, describing himself as a "Godfearing person" and stating a legitimate belief that some higher power has kept him safe during his time in. He emphasized, in particular, that he was shifting away from the Odinistic religious foundations of the group, and "going back to Jesus." While I am not an expert in religion, and would defer to other experts on the specifics religious beliefs, I have an understanding of these beliefs as they relate to white supremacy. In this context, I interpret the transition away from Odinistic religious beliefs as a positive factor, given that they often serve as the foundation for violent racist belief systems within such gangs.

*Summary:*

The pathways into membership in a group like The Unforgiven group are varied. Some very bigoted individuals seek out hate groups to express their rage. Some radicalize themselves online and search for white supremacist groups to help them realize their hate-filled goals. But a non-trivial proportion of those who join these groups do so because the group satisfies other needs, including a desire to resolve isolation/establish social attachment, as a perceived solution to the need for protection from victimization, or because they facilitate other needs. It is my belief that Mr. Allen fits most closely with this last set of pathways. While I cannot say that he has not internalized some of the bigoted beliefs expressed by the group, I am reasonably certain—based on his conversation with me—that he did not originally seek out the group because of the need for an outlet for bigoted beliefs. Instead, he characterized his need to join the group as a product of protection from victimization and to resolve isolation. He describes joining, and his subsequent gang tattoos, as something he regrets, and has even attempted to exit through "retirement," although that request was denied. All of these complexities—both positive and negative—should be fully considered when evaluating and contextualizing Mr. Allen's case.

Brendan Lantz

Brendan Lantz, Ph.D.